Submitted on remand August 13, affirmed October 15, 2014

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**GLENN CHARLES PARKER,**
*Defendant-Appellant.*

Multnomah County Circuit Court
0606-47424; A134163

337 P3d 936

Peter Gartlan, Chief Defender, and Emily Schoonmaker, Deputy Public Defender, Legal Services Division, Office of Public Defense Services, filed the opening brief for appellant. Peter Gartlan, Chief Defender, and Joshua B. Crowther, Chief Deputy Defender, filed the supplemental brief.

Hardy Myers, Attorney General, Mary H. Williams, Solicitor General, and Anna M. Joyce, Assistant Attorney General, filed the answering brief for respondent. Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Tiffany Keast, Assistant Attorney General, filed the supplemental brief.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Nakamoto, Judge.

HASELTON, C. J.

## HASELTON, C. J.

This case is on remand from the Oregon Supreme Court for a second time. For the reasons explained below, we now conclude that, because defendant was not seized for purposes of Article I, section 9, of the Oregon Constitution,[1] the trial court did not err in denying defendant's motion to suppress. Accordingly, we affirm.

In our original opinion, we vacated the trial court's denial of defendant's motion to suppress evidence found during the search of defendant's person and remanded the case to the trial court for reconsideration in light of our decision in *State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008) (*Ashbaugh I*), rev'd, 349 Or 297, 244 P3d 360 (2010) (*Ashbaugh II*), in which we had held that a subjective test applied to determine whether a defendant had been stopped. *State v. Parker*, 225 Or App 610, 202 P3d 205 (*Parker I*), adh'd to as modified on recons, 227 Or App 413, 206 P3d 259 (2009) (*Parker II*). After the Supreme Court reversed our decision in *Ashbaugh I*, it vacated our decision in *Parker* and remanded for reconsideration in light of its decision in *Ashbaugh II*. *State v. Parker*, 349 Or 663, 249 P3d 1281 (2011) (*Parker III*).

On remand, noting that the facts of this case were "materially indistinguishable" from those in our decision in *State v. Highley*, 219 Or App 100, 180 P3d 1230 (2008) (*Highley I*), rev'd, 354 Or 459, 313 P3d 1068 (2013) (*Highley II*), we concluded that defendant had been unlawfully seized because a reasonable person in his position would have concluded that he was the subject of an investigation and not free to leave when the officer asked defendant whether he had any warrants, obtained defendant's identifying information, and then returned to his vehicle to run a check to determine whether defendant was the subject of any warrants. *State v. Parker*, 242 Or App 387, 255 P3d 624 (2011) (*Parker IV*). Following its reversal of our decision in *Highley I*, the Supreme Court vacated our decision in *Parker IV* and, once again, remanded this case for

---

[1] Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

reconsideration in light of its decisions in *Highley II, State v. Backstrand*, 354 Or 392, 313 P3d 1084 (2013), and *State v. Anderson*, 354 Or 440, 313 P3d 1113 (2013). *State v. Parker*, 355 Or 751, 331 P3d 1010 (2014) (*Parker V*).

With four amplifications noted below, we take the material facts and a description of the procedural history of this case from *Parker I*, reiterating as we did there that "[t]he trial court expressly found both the police officers' and the defendant's accounts of the facts to be 'accurate, and a fair recitation of what occurred.'" 225 Or App at 612.

"Consistently with that finding, the salient facts here are as follows: On May 23, 2006, defendant was a passenger in a pickup truck stopped by Portland Police Officers Cioeta and Boman for expired license plate tags. Boman asked the driver and the other passenger for their identification and obtained their information. Cioeta asked defendant if he had any outstanding warrants; defendant replied that he did not. Cioeta then asked for defendant's identification,[2] wrote down defendant's information, returned the identification, and then immediately returned to the police vehicle.

"The officers ran all the occupants' information and checked them for warrants. In the meantime, at least one additional police vehicle arrived on the scene. Boman then asked the driver and another passenger to get out of the truck. The driver was cited for driving while suspended. Boman conducted a patdown search of the other passenger, informed him he was under arrest for an outstanding warrant, and placed him in custody. [Cioeta decided to tow the truck and inventory its contents because the driver's license was suspended.] Cioeta then approached defendant and asked him to get out of the truck. Cioeta asked defendant if he had any weapons; defendant denied that he did. Cioeta then asked for permission to search defendant, and defendant consented. Cioeta conducted a patdown search of defendant and retrieved a switchblade knife from defendant's pants pocket. [At no point during the encounter did Cioeta tell defendant that he was free to leave.] Defendant was arrested and subsequently charged with carrying a concealed weapon.

---

[2] Defendant testified that he "didn't really have ID, as such" but showed Cioeta a work "badge[]" with his "picture on it." Cioeta asked defendant for his name and date of birth.

"Before trial, defendant moved to suppress the evidence. The trial court denied that motion, concluding that 'regardless of anything that happened before, the consent was freely given and was voluntary.' Following a stipulated facts trial, the court convicted defendant of carrying a concealed weapon, ORS 166.240(1)."

*Parker I*, 225 Or App at 612-13.

On remand, the dispositive issue is whether the encounter between defendant and the officers constituted a seizure for purposes of Article I, section 9. In supplemental briefing, relying on the historical and procedural facts as stated in *Parker I*, defendant contends that he was seized for purposes of Article I, section 9, because "there were numerous shows of authority creating the type of police dominated atmosphere that would indicate to a reasonable person that they were not free to leave and terminate the encounter." Specifically, defendant explains:

"[T]he facts demonstrate an unbroken chain of police dominated events: the officer stopped the car in which defendant was a passenger; the police investigated defendant's associates; the police arrested defendant's associates; the police controlled defendant's movement by removing him from the car; the police obtained defendant's information to start a criminal investigation; and the police disregarded the defendant's denial of wrongdoing and requested consent. At no time during th[at] sequence of events did defendant leave and return or engage in a 'cat and mouse' game of legerdemain with the officers. A reasonable person in that same position would believe that the officer was using his authority to seize the person until the investigation was complete or the officer indicated as much."

(Citation omitted.)

As the Supreme Court explained in *Ashbaugh II*, a person is seized for purposes of Article I, section 9,

"(a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under the totality of the circumstances *would* believe that (a) above has occurred."

349 Or at 316 (emphasis in original). The guiding principle in determining whether an encounter is a constitutionally

significant seizure is whether the officer has manifested a "show of authority" that intentionally and significantly restricts an individual's liberty. *Backstrand*, 354 Or at 399 ("What distinguishes a seizure (either a stop or an arrest) from a constitutionally insignificant police-citizen encounter 'is the imposition, either by physical force or through some "show of authority," of some restraint on the individual's liberty.'" (Quoting *Ashbaugh II*, 349 Or at 309.)).

A "show of authority" is a "precise concept" that requires "a reasonable perception that an officer is exercising his or her official authority to restrain." *Backstrand*, 354 Or at 401. In other words, "[e]xplicitly or implicitly, an officer must convey to the person with whom he is dealing, either by word, action, or both, that the person is not free to terminate the encounter or otherwise go about his or her ordinary affairs." *Id.* at 401-02. Although that "inquiry necessarily is fact-specific and requires an examination of the totality of the circumstances," *id.* at 399, we and the Supreme Court have identified four salient principles, which inform our resolution of this case.

First, "[p]assengers in a stopped vehicle—whether [the vehicle has been] lawfully or unlawfully stopped—are not seized merely by virtue of their status as passengers." *State v. Ross*, 256 Or App 746, 754, 304 P3d 759 (2013). As the Supreme Court explained in *State v. Amaya*, 336 Or 616, 630-31, 89 P3d 1163 (2004),

> "[i]t is a truism that all passengers in a validly stopped car have been 'stopped,' at least physically. However, such a stop is not a 'seizure' of those passengers for constitutional purposes. It also is true that an officer may take reasonable steps respecting the passengers, including, for example, asking the passengers to exit the vehicle so the officer may search the vehicle, assuming that the driver has consented to the search or that it otherwise is justified. However, an officer's further exercise of coercive authority over the passengers after they are out of the vehicle may, in certain circumstances, constitute a seizure."

(Citation omitted.) In other words "a passenger is only seized when there has been the imposition, either by physical force or through some show of authority, of some restraint on the

individual's liberty." *Ross*, 256 Or App at 754 (internal quotation marks omitted); *see id.* at 752 ("Either a police 'show of authority' during a traffic stop is sufficient to constitute a seizure under *Ashbaugh [II]* with respect to a passenger or it is not.").

Second, "[a] mere request for identification made by an officer in the course of an otherwise lawful police-citizen encounter does not, in and of itself, result in a seizure." *Backstrand*, 354 Or at 410. As the Supreme Court explained, "the fact that an individual—for reasons personal to that individual—feels obliged to cooperate with the officer simply because of the officer's status is not the form or source of coercion that is of constitutional concern." *Id.* at 402. Applying that principle in *Highley II*, the court reasoned that the officer's inquiry about whether the defendant was on probation followed by a request for identification, was "a straightforward request for information and cooperation of the kind that this court, since [*State v.*] *Holmes*, [311 Or 400, 813 P2d 28 (1991),] has continued to affirm police officers may make without implicating Article I, section 9." 354 Or at 469.

Third, in *Backstrand*—as well as in *Highley II* and *Anderson*—the Supreme Court "repeatedly emphasized that neither briefly holding a person's identification card, nor calling in the person's identification information to check for warrants, necessarily and always meant that the person was stopped." *State v. Thompson*, 264 Or App 754, 759, 333 P3d 1125 (2014). As the Supreme Court explained in *Highley II*,

> "a person who decides to cooperate with an officer's request for identification reasonably can expect that the officer will do something with that identification, such as seek to verify the person's identity or status. That the officer either retains the identification for a reasonable time while doing so, or swiftly returns the identification and uses information from it for those purposes, are not actions that transform a noncoercive encounter into one in which the individual's liberty is significantly restrained through an exercise of coercive police authority."

354 Or at 470 (citations omitted).

Finally, as we reasoned in *State v. Dudley*, 245 Or App 301, 263 P3d 1054 (2011), *rev den*, 354 Or 838 (2014), unless coupled with other coercive actions, the combination of an officer (a) asking a passenger to get out of a car that the officer intends to search before having it towed due to the driver's arrest and (b) then seeking consent to search the passenger after he or she has denied having drugs or weapons in his or her possession does not constitute a "show of authority."[3] Specifically, in *Dudley*, we reasoned:

> "In this case, the officer's actions toward defendant did not amount to a 'show of authority' that restricted her movement such that she was 'stopped' when she consented to the officer's search of her purse. * * * [T]he officer's question whether defendant possessed any drugs or weapons was not a constitutionally significant 'show of authority,' and neither was his request that she step out of the car. Unlike in *State v. Courtney*, 242 Or App 321, 325, 255 P3d 577[, *rev den*, 351 Or 401] (2011), the officer's question and his request that defendant step out of the car were not coupled with any other show of authority, such as the officer's command to the defendant in *Courtney* that he place his hands on top of his head and interlace his fingers. It follows under *Ashbaugh II* that the officer did not 'intentionally and significantly' interfere with defendant's liberty or freedom of movement when he asked defendant to get out of the car and that a reasonable person in defendant's situation would not have believed that the officer had done so. Accordingly, we conclude that the trial court properly denied defendant's motion to suppress."

245 Or App at 306-07.[4]

---

[3] The defendant in *Dudley* petitioned the Supreme Court for review of our decision. The court held that petition in abeyance pending the issuance of its decisions in *Backstrand*, *Highley II*, and *Anderson*. Following the issuance of its decisions in those cases, the Supreme Court denied review in *Dudley*.

[4] *See State v. Smith*, 247 Or App 624, 629, 270 P3d 382 (2012) (noting that, although it appeared that the officer had a valid reason related to the traffic stop for asking the defendant passenger to step out of the car—that is, the officer intended to have the car towed after learning that the driver's license was suspended—that reason was not expressed to the defendant when he was asked to step out of the car and the defendant was never told that he was free to leave; holding that "the officer's question whether defendant possessed any drugs or weapons was not a constitutionally significant 'show of authority' and neither was his request that he step out of the car"); *State v. Jones*, 241 Or App 597, 602, 250 P3d 452, *rev den*, 351 Or 318 (2011) (noting that the license of the driver was invalid and that the defendant and the other passenger had no identification;

Applying those principles to the circumstances of the encounter in this case, we conclude that defendant was not stopped because the officer's actions toward defendant did not amount to a "show of authority." Here, defendant was a passenger in a truck that was lawfully stopped by two officers. Officer Boman obtained identifying information from the driver and another passenger. Officer Cioeta spoke with defendant. In response to Cioeta's inquiry, defendant indicated that he had no outstanding warrants and provided identifying information, which the officer ran to check for warrants. As explained above, under the principles described in *Backstrand, Highley II,* and *Anderson,* those circumstances do not give rise to a constitutionally significant show of authority.

As a result of running the occupants' information, the officer learned that the other passenger had an outstanding warrant. In the meantime, at least one additional police vehicle arrived. At that point, Boman asked the driver and the other passenger to get out of the truck. The driver was cited for driving with a suspended license, and the other passenger was arrested and placed in custody. Cioeta decided to tow the truck and inventory its contents because the driver's license was suspended.

At that point in the encounter, a single officer—Cioeta—turned his attention to defendant, who had remained in the truck's passenger seat. Cioeta asked defendant to get out of the truck and inquired as to whether he had weapons. When defendant denied that he possessed weapons, Cioeta sought his consent to search. Although Cioeta did not tell defendant that he was free to leave at any point during the encounter, there is no evidence that Cioeta drew a weapon, raised his voice, or otherwise spoke in a manner that was nonconversational.

Viewed in their entirety, those circumstances are materially indistinguishable from those in *Dudley* in which

rejecting defendant's argument that "a reasonable person, in the presence of three officers and three patrol cars with overhead lights on, at 4:30 a.m., having denied that he was carrying drugs or weapons, would, upon being asked thereafter for consent to search, feel that his liberty or freedom of movement had been constrained—would feel, in other words, that he did not have the option of simply refusing to respond and walking away"); *see also State v. Lantzsch,* 244 Or App 330, 260 P3d 662, *rev den,* 351 Or 318 (2011).

we held that the defendant was not seized for purposes of Article I, section 9. As in *Dudley*—and consistently with the principles articulated in *Backstrand* and *Highley II*— the circumstances here demonstrate that the officers asked defendant, a passenger in a lawfully stopped truck, for information (*e.g.*, identifying information, whether he had any warrants or possessed weapons) and sought his cooperation in various respects (*e.g.*, asking defendant to get out of the truck after the driver had been cited for driving with a suspended license, the other passenger had been arrested, and defendant had been unable to produce identification other than a work badge; asking for defendant's consent to search). Nothing about those circumstances demonstrates that Cioeta, explicitly or implicitly, conveyed to defendant that he was not free to terminate the encounter or otherwise go about his ordinary affairs. *See Highley II*, 354 Or at 473 ("None of [the officer's] actions—the request for identification, the check of defendant's probationary status, and the request for consent to search—individually constituted a seizure. Considered in combination, they were simply acts that occurred sequentially. They did not combine to form a whole greater than the sum of their parts.").

In sum, given the totality of the circumstances, a reasonable person would not have believed that his or her liberty was significantly restrained. Accordingly, the trial court did not err in denying defendant's motion to suppress.

Affirmed.