Submitted on remand from the Oregon Supreme Court March 22, affirmed
July 20, petition for review denied November 10, 2011 (351 Or 318)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

RICHARD LANTZSCH,
*Defendant-Appellant.*

Washington County Circuit Court
C070765CR; A136096

260 P3d 662

Peter Gartlan, Chief Defender, and Mary Shannon
Storey, Deputy Public Defender, Office of Public Defense
Services, filed the opening brief for appellant. Peter Gartlan,
Chief Defender, and Ernest G. Lannet, Chief Deputy
Defender, filed the supplemental brief.

Hardy Myers, Attorney General, Mary H. Williams,
Solicitor General, and Anna M. Joyce, Assistant Attorney
General, filed the answering brief for respondent. John
Kroger, Attorney General, Mary H. Williams, Solicitor

General, and Tiffany Keast, Assistant Attorney General, filed the supplemental brief.

Before Sercombe, Presiding Judge, and Brewer, Chief Judge, and Nakamoto, Judge.

BREWER, C. J.

**BREWER, C. J.**

This case is on remand from the Oregon Supreme Court, which vacated our prior decision, *State v. Lantzsch*, 229 Or App 505, 214 P3d 22 (2009) (*Lantzsch I*), and remanded for reconsideration in light of *State v. Ashbaugh*, 349 Or 297, 244 P3d 360 (2010) (*Ashbaugh II*). *State v. Lantzsch*, 349 Or 663, 249 P3d 1281 (2011) (*Lantzsch II*). In *Lantzsch I*, we vacated the trial court's order denying defendant's motion to suppress evidence found during the search of defendant's person and remanded the case to the trial court to determine whether "defendant believed that he was not free to leave when the deputy asked him to get out of the car." 229 Or App at 516-17. Our holding in that regard was predicated on our decision in *State v. Ashbaugh*, 225 Or App 16, 200 P3d 149 (2008) (*Ashbaugh I*), which the Supreme Court reversed in *Ashbaugh II*. The issue on remand is whether, in light of *Ashbaugh II*, the encounter between defendant and the officer constituted a seizure under Article I, section 9, of the Oregon Constitution.[1]

We take the material facts and a description of the procedural history from our opinion in *Lantzsch I*.

"Defendant was a passenger in a car that a sheriff's deputy observed making an illegal turn at 12:35 a.m. The deputy initiated a traffic stop and asked the driver for her identification. The driver replied that she had no identification, but thought that her license was suspended. The deputy asked her to step out of the car and accompany him to the police cruiser. The driver complied. The deputy then began running a computer check to verify the driver's identity and whether her license was, in fact, suspended. During that time, which the deputy testified lasted 'five or six minutes,' defendant was left unattended in the passenger seat of the car. The deputy testified that defendant turned to look at the police cruiser several times during that period.

---

[1] The state does not dispute our conclusion in *Lantzsch I* that the officer lacked reasonable suspicion to believe that defendant was involved in criminal activity, *see* 229 Or App at 514, and nothing in *Ashbaugh II* casts doubt on that holding. Accordingly, the only issue in this case is whether defendant was unlawfully seized.

"After completing the records check, the deputy arrested the driver on an outstanding warrant. He also searched her, finding a small packet of marijuana. The deputy placed the driver in the back of the police cruiser and then approached defendant, who was still seated in the passenger seat of the car. The deputy stood outside the car, with defendant still seated in the passenger's seat, and asked defendant to step out of the car and talk to him. The deputy did not tell defendant that he was free to go. The deputy testified that he did not order defendant to get out of the car but, rather, merely asked him to step out so they could talk. Defendant got out of the car and was asked to walk back to the rear of the car to meet the deputy. By this time, a second deputy had arrived to act as a cover officer and was standing behind the deputy who had first contacted defendant. As they reached the rear of the car, the deputy asked defendant whether he had any 'weapons or contraband.'

"* * * * *

"Defendant told the deputy that he was carrying a pocketknife. The deputy asked defendant if he could 'check' for the knife.

"* * * * *

"The deputy searched defendant, and found a package of methamphetamine in defendant's pants pocket."

229 Or App at 507-08.

The trial court denied defendant's motion to suppress and gave the following reasons for its denial:

"Okay. Well, I don't find that [defendant] did anything while he was left alone in the car that really led the officer to believe that [defendant] was anymore * * * dangerous than anybody else would be in that particular situation. I mean, anybody would turn around and look and see what was going on with your—the person who was driving the car and the police officer, and then turn back, and there would be a little movement, and there was nothing extraordinary in this case.

"I do find that in the legal sense, as opposed to the Newtonian sense, physics, that [defendant] wasn't stopped when the car was stopped, and when the officer asked him to—if he would get out of the car and talk to him, that

wasn't * * * under Oregon or federal law a show of authority that would amount to a stop."

*Id.* at 510.

We began our analysis in *Lantzsch I* by holding that the officer was required to have an independent basis for detaining defendant and that the officer had lacked such an independent basis. *Id.* at 513-14. Accordingly, the dispositive question became "whether the deputy's conduct constituted an unjustified seizure of defendant." *Id.* Consistently with the construct that we had followed in *Ashbaugh I*, we concluded that,

> "[a]t the time the deputy asked defendant to get out of the car, a second deputy had arrived and was standing 'a few feet' behind the deputy; defendant was asked not only to get out of the car, but also to walk to the rear of the car to speak with the deputy. According to the deputy's testimony, he did not tell defendant that he was free to go, and there is no evidence in the record showing that the deputy made defendant aware that he was being approached simply as part of the deputy's investigation of the driver. Indeed, the deputy said nothing to defendant to indicate that he himself was not the target of a criminal investigation. Thus, if defendant believed that he was not free to leave when the deputy asked him to get out the car, that belief was reasonable."

*Id.* at 516. Having concluded that, if defendant had believed that he was not free to leave, that belief was reasonable, we remanded the case to the trial court for a determination of defendant's subjective belief. *Id.*

In *Ashbaugh II*, the Supreme Court reversed our decision in *Ashbaugh I*. In *Ashbaugh II*, the Supreme Court "abandon[ed] forthrightly the subjective component" of its prior case law and set out the following template for determining whether a person has been seized:

> "A 'seizure' of a person occurs under Article I, section 9, of the Oregon Constitution: (a) if a law enforcement officer intentionally and significantly restricts, interferes with, or otherwise deprives an individual of that individual's liberty or freedom of movement; or (b) if a reasonable person under

the totality of the circumstances *would* believe that (a) above has occurred."

349 Or at 316 (emphasis in original). As the court indicated, the guiding principle in determining whether an encounter is a constitutionally significant seizure is whether the officer has manifested a "show of authority" that restricts an individual's "freedom of movement." *Id.* at 317. In light of the Supreme Court's overriding analysis in *Ashbaugh II*, our original disposition of this case—a remand to the trial court to determine whether defendant subjectively believed he was not free to leave—was erroneous. Accordingly, we now analyze the circumstances of this case under the principles announced in *Ashbaugh II*.

Our recent opinion in *State v. Jones*, 241 Or App 597, 250 P3d 452 (2011), is instructive. There, the defendant was a passenger in a car that was pulled over by a police officer after the driver committed a traffic infraction. *Id.* at 599. The officer, Berne, requested the defendant's identification; the defendant did not have any, but gave the officer his name and birth date. *Id.* at 600. Berne told the defendant and another passenger that they were free to leave; the defendant remained in the car. *Id.* After Berne discovered that the driver did not have a valid license and the car had to be towed, another officer, Jensen, began "getting people out of the car." *Id.* Jensen asked the defendant to get out and, after the defendant complied, Jensen asked him whether he had any drugs or weapons on his person. *Id.* The defendant replied that he did not, and Jensen asked for consent to search the defendant's person. *Id.* The defendant acquiesced, and the search revealed controlled substances. *Id.* About five minutes had elapsed between the time Berne told the defendant that he was free to leave and the search. *Id.*

In affirming the trial court's denial of defendant's motion to suppress in *Jones*, we explained that,

"[a]s in [*Ashbaugh II*], defendant here challenges a police officer's request to search that followed the lawful seizure of a companion. In *Ashbaugh* [*II*], the defendant's husband was arrested and the defendant remained in a public park for about five minutes before the officers returned and reinitiated contact with her. Here, the driver

of the car in which defendant was a passenger was lawfully pulled over for a traffic infraction. Although the officer retained the driver's identification to further investigate the traffic stop, the officer told defendant that he was free to leave. Defendant remained in the car and was there for about five minutes before a second officer contacted defendant. Also, in *Ashbaugh [II]* as here, the police officer's request for consent to search occurred after the defendant had denied possessing contraband."

*Id.* at 603-04. We rejected the defendant's contention that the officer's question about drugs or weapons had been a "show of authority" that restricted his movement:

"There is no such 'show of authority,' as the Supreme Court has implicitly construed that term in *Ashbaugh [II]*, on this record. Jensen was the sole officer talking to defendant; Berne was still in his patrol car preparing the driver's citation, and a third officer was standing some distance away with the driver. There were no weapons drawn, and Jensen testified that he spoke with defendant in the same tone he used when answering counsels' questions at the motion hearing. We conclude that, under *Ashbaugh [II]*, Jensen did not 'intentionally and significantly' interfere with defendant's liberty or freedom of movement and, also under that case, we must conclude that a reasonable person in defendant's situation would not have believed Jensen had done so."

*Id.* at 604.

The same result obtains here. Although, unlike in *Jones*, the deputy here did not tell defendant that he was free to leave, there were no weapons drawn and no evidence that the deputy raised his voice or otherwise spoke in a nonconversational manner when he asked defendant to step out of the car. Although a second officer was standing "a few feet" behind the deputy, there was no evidence that the second officer made any show of authority toward defendant or, indeed, had any interaction with defendant at all. In that regard, the Supreme Court's observation in *Ashbaugh II* is pertinent: here, the deputy "did not, for example, position himself and his fellow officer in a way that would suggest to defendant that [he] was surrounded," and, thus, the mere presence of a second officer is, on this record, not a sufficient basis for us to

conclude that the deputy's "manner or actions" involved a "show of authority." *Ashbaugh II*, 349 Or at 317-18.

This case is distinguishable from our recent decision in *State v. Courtney*, 242 Or App 321, 255 P3d 577 (2011). In that case, the defendant was a passenger in a car that was pulled over for a traffic violation, and the driver was arrested for driving with a revoked license. *Id.* at 324. The police officer, Stenzel, told the defendant not to leave the car. After ordering the driver and another passenger from the car, Stenzel approached the defendant, who was still seated in the car, and asked him if he had any weapons. *Id.* at 325. The defendant said that he did not; Stenzel asked for consent to search the defendant, and the defendant gave consent. Stenzel then asked the defendant to place his hands on his head, interlace his fingers, and get out of the car. The defendant complied, and as he got out of the car, a methamphetamine pipe fell out of the car. *Id.* The defendant moved to suppress that evidence, arguing that he had been unlawfully seized by Stenzel's actions with regard to the occupants of the car and that a reasonable person, observing Stenzel's actions, would not have felt free to leave.

Applying the Supreme Court's analysis in *Ashbaugh II*, we concluded that

"[S]everal factors counsel in favor of concluding that a reasonable person in defendant's position would have believed that his or her freedom of movement had been restricted by a police show of authority. First, rather than telling defendant he was free to leave, [officer] Stenzel—however casually or nonchalantly—initially told both passengers in the car to stay where they were. Second, there were two officers at the scene, and, although the cover officer did not interact with defendant, his presence on the nearby sidewalk with Bennett and the back seat passenger is a relevant consideration when determining whether there was a show of police authority that restrained defendant's liberty. Third, although Stenzel had a valid reason related to the traffic stop for asking defendant to step out of the car (because Stenzel intended to have it towed), that reason may not have been expressed to defendant. Finally, and perhaps most significantly, Stenzel directed defendant to put his hands on top of his head, with his fingers interlaced—an order with which defendant complied."

*Id.* at 332-33. Under the totality of those circumstances, we concluded that

> "[u]nder the standard enunciated in *Ashbaugh* [*II*], a reasonable person in defendant's position would have believed, prior to the point at which the car door was opened, that his or her liberty and freedom of movement had been restricted. Defendant was seized in the constitutional sense."

*Id.* at 333.

Here, unlike in *Courtney*, the deputy did not direct defendant to take any physical action beyond stepping out of, and walking to the back of, the car. Moreover, the particular physical action directed in *Courtney*, that the defendant place his hands on top of his head and interlace his fingers, came directly after Stenzel's question to the defendant about weapons. Thus, Stenzel's question, unlike the deputy's identical question in this case, was coupled with an order that the defendant take an action designed to prevent him from obtaining access to any weapon. By contrast, when the deputy here asked defendant to get out of the car, he had not been subjected to the kind of "show of authority" to which the defendant in *Courtney* was subjected. It follows under *Ashbaugh II* that the officer did not "intentionally and significantly" interfere with defendant's liberty or freedom of movement when he asked defendant to get out of the car and that a reasonable person in defendant's situation would not have believed that the officer had done so.

Affirmed.