Argued and submitted October 4, 2022, reversed and remanded May 17, 2023

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

SHERRY LYNN VANNOY,
*Defendant-Appellant.*

Harney County Circuit Court
20CR15072; A175797

530 P3d 503

Defendant appeals from a judgment convicting her of one count of unlawful possession of methamphetamine, a Class A misdemeanor. She assigns error to the trial court's denial of her motion to suppress evidence, arguing that she was unlawfully stopped without reasonable suspicion of a crime when Officer Held stopped the van she was traveling in as a passenger; investigated the driver for marijuana crimes; asked defendant "about marijuana" and inspected her sandwich bag of marijuana; asked defendant to exit the vehicle so he could search it for more marijuana; and, finally, asked for her consent to the search of her handbag. *Held*: The Court of Appeals accepted the state's concession that the officer lacked reasonable suspicion to investigate defendant for a marijuana crime, and thus only considered whether defendant was seized. Considering that question, the court concluded that, in light of the totality of the circumstances, a reasonable person in defendant's situation would not have felt free to leave and would have believed that both the driver and defendant were the subjects of an investigation into whether they illegally possessed marijuana. Thus, by the time Held asked defendant to consent to a search of her bag, she was stopped. The trial court therefore erred in denying defendant's motion to suppress.

Reversed and remanded.

Robert S. Raschio, Judge.

Stacy Du Clos, Deputy Public Defender, argued the cause for appellant. Also on the briefs was Ernest G. Lannet, Chief Defender, Criminal Appellate Section, Office of Public Defense Services.

Colm Moore, Assistant Attorney General, argued the cause for respondent. Also on the brief were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Shorr, Presiding Judge, and Mooney, Judge, and Pagán, Judge.

SHORR, P. J.

Reversed and remanded.

**SHORR, P. J.**

Defendant appeals from a judgment convicting her of one count of unlawful possession of methamphetamine, a Class A misdemeanor.[1] She assigns error to the trial court's denial of her motion to suppress evidence, arguing that she was unlawfully stopped without reasonable suspicion of a crime. For the reasons that follow, we agree that defendant was unlawfully stopped, and therefore reverse and remand.

We review a trial court's denial of a motion to suppress for legal error. *State v. Prouty*, 312 Or App 495, 496, 492 P3d 734 (2021). In so doing, we are bound by the trial court's findings of fact so long as there is constitutionally sufficient evidence in the record to support them. *Id.* To the extent that the court failed to make express findings on pertinent historical facts, we presume that the court found those facts in a manner consistent with its ultimate conclusion. *Id.* We take the facts from the record made at the hearing on defendant's motion to suppress.

Around 4:30 p.m. in the afternoon on a day in November 2019, Officer Held with the Oregon State Police was on Highway 20 in Harney County when he observed a van traveling over the posted speed limit. He activated his lights and initiated a traffic stop. Upon approaching the window and making contact with the driver, Held "[i]mmediately *** smelled a strong odor of marijuana emitting from inside the vehicle." Defendant was in the front passenger seat and Held recognized her as a local. Held asked for the driver's license, as well as the rental vehicle documentation upon learning that the vehicle was rented. The driver provided those documents. Held might have also "conversed with [defendant] a little bit" about family she had in the area.

At that point, however, Held stopped processing the traffic stop and began "investigating the marijuana possession" by asking "how much marijuana was inside the vehicle." Held asked about the amount specifically because

---

[1] Defendant was convicted under ORS 475.894(2)(a) (2019), *amended by* Or Laws 2021, ch 2, § 17; Or Laws 2021, ch 591, § 39. Today that same conduct constitutes a Class E violation. ORS 475.894(2)(a).

"there are numerous marijuana laws, and they're all weight-dependent." The driver told Held that he had "approximately an ounce," and Held asked "if [he] could see it." Held testified that he asked to see it because "not everybody tells the truth, especially if they're marijuana-savvy, they'll say an ounce because they know they can have an ounce," and also because of "the strong odor. I wasn't able to tell where that odor was coming from within the vehicle or that there could be more. I can't smell weight. I could just smell that it was strong."

The driver exited the van and walked to the rear of the vehicle, where he retrieved what Held "estimated as an approximately gallon-sized plastic bag containing marijuana." Based on Held's training and experience, he estimated that the bag contained approximately two ounces. Held testified that the marijuana odor was not noticeably stronger at the rear of the vehicle, and that he suspected that there could be more marijuana or "contraband" in the vehicle because, in his experience, "very rarely do you just find green marijuana. There's also the accompanying contraband, like pipes, grinders, packaging material, joints, that sort of thing." At the time, it was a Class B violation to possess more than one ounce but not more than two ounces of usable marijuana in a public place and a Class B misdemeanor to possess more than two ounces but not more than four ounces of usable marijuana in a public place, with additional increasing penalties for larger amounts. *See former* ORS 475B.337 (2019), *renumbered and amended as* ORS 475C.337 (2021).[2]

Held explained to the driver "why [he] thought it was two ounces" and asked to search the vehicle. The driver consented. Held testified that, by this time of the stop, he

---

[2] Held testified that when marijuana paraphernalia is "coupled with an illegal amount of marijuana," he considers it "contraband." We note that, although possession of certain amounts of marijuana was and is illegal, possession of marijuana "contraband" or paraphernalia for personal use is not. *Cf. former* ORS 475B.376 (2017), *renumbered as* ORS 475C.373 (2021) (defining Class B violation of selling or delivering "marijuana paraphernalia" to a person under 21 years of age); ORS 475.525 (prohibiting the sale or delivery of "drug paraphernalia" intended for use with "controlled substances"); ORS 475.005(6)(b) (explicitly excluding cannabis products from the definition of "[c]ontrolled substance[s]").

believed he had probable cause to search "the entire vehicle and its contents," including defendant's possessions.

Although Held had not had "very much" interaction with defendant by this point, he now turned to her and asked "about marijuana." Held did so because "it would be almost near impossible to tell where the odor was coming from inside the vehicle, so it was reasonable to think that being that she was in the [van], she would have some belongings that could hold marijuana." Defendant presented him with a small sandwich bag containing marijuana that he estimated to be approximately an ounce. Held then asked defendant to step out of the van so he could conduct his search. When asked by counsel at the hearing whether defendant was free to leave at that point in time, Held testified that "[i]f she would have asked to go, then at that point, I would have had to make a decision if she was free to go or not, but she never asked to leave." When asked to clarify whether defendant would have "need[ed] to ask before she left the scene," Held responded that

> "I don't think I've ever ran into the situation where—I've run into the situation where passengers have asked to leave, and there wasn't reason to stop them, and so I let them go. I don't know—it's hard to say. I've never been in that situation where somebody just left."

Held began searching the vehicle and located a small handbag under the passenger seat where defendant had been seated. He did not "put the bag to [his] nose" or smell the odor of marijuana emanating from the bag, as at that time, "[a]ll [he] could smell was marijuana emitting from inside of the van." He asked defendant if it was her bag, and she confirmed that it was. Held asked if he could look in the bag, and she said yes. Inside the handbag, Held discovered a capped syringe, plastic straw, clear plastic bag, and pipe that were later confirmed to contain methamphetamine residue. Held did not end up writing a traffic citation or seizing any marijuana.

Defendant was charged with unlawful possession of methamphetamine and moved to suppress the evidence and statements obtained during the traffic stop. At the hearing

on the motion, Held testified to the facts above. No other evidence of the stop was presented at the hearing.

Defendant argued that she had been stopped without reasonable suspicion at least by the time she was asked to consent to a search of her bag. As a result, she contended, her consent was the product of that earlier constitutional violation. In response, the state argued that the odor of marijuana alone provided Held with reasonable suspicion to question defendant regarding marijuana. The state relied in large part on our opinion in *State v. Vennell*, 274 Or App 94, 98-99, 359 P3d 1255 (2015), *rev den*, 358 Or 529 (2016), which held that "a strong odor of marijuana emanating from a person" can supply reasonable suspicion that the person is carrying a large amount of marijuana and therefore committing a weight-dependent marijuana possession crime.

The trial court denied the motion, concluding that defendant was not stopped during the interaction but that, nevertheless, Held had reasonable suspicion to investigate defendant. Citing to *Vennell*, the court concluded that the strong odor of marijuana provided Held with reasonable suspicion of a marijuana crime, and reasoned that, because the odor was throughout the vehicle and not clearly tied to just the driver or the trunk, it was reasonable for Held to suspect that there was more marijuana in the vehicle and to investigate further. Defendant proceeded to a jury trial and was convicted of one count of unlawful possession of methamphetamine. This timely appeal followed.

On appeal, defendant assigns error to the trial court's denial of her suppression motion. Specifically, defendant renews her argument that she was stopped—at least by the point of the interaction when Held requested her consent to the search of her bag—in large part because Held's marijuana investigation was directed at all occupants of the van and not the driver alone. Defendant likens Held's inquiry "about marijuana" to the facts in *State v. Almahmood*, 308 Or App 795, 804, 482 P3d 88 (2021), where we concluded that an officer's "non-negotiable command" that a person "establish that he had not committed a crime" effectuated a stop because reasonable people "would not expect that they could refuse" such a command.

Defendant further argues that Held did not have reasonable suspicion to investigate defendant for a marijuana crime based only on the odor of marijuana, citing our recent cases such as *State v. Moore*, 311 Or App 13, 21, 488 P3d 816 (2021) ("given the legality of an adult possessing some amount of marijuana in Oregon, the smell of marijuana in a car in which an adult is present is no longer remarkable"; thus, "the smell of marijuana, without more, does not support a reasonable suspicion that defendant possessed an *unlawful* amount of marijuana" (emphasis in original)). The state concedes that Held lacked reasonable suspicion to investigate defendant, acknowledging that our court has "severely undermined or effectively overturned" *Vennell* in the time since the suppression hearing. The state instead argues that defendant was never stopped, because a reasonable person in defendant's position would have understood that the investigation was focused on the driver rather than her.

We accept the state's concession that Held lacked reasonable suspicion to investigate defendant for a marijuana crime. *See Moore*, 311 Or App at 22. Thus, we proceed to consider the only remaining issue: whether defendant was seized when Held stopped the van she was traveling in as a passenger; investigated the driver for marijuana crimes; asked defendant "about marijuana" and inspected her sandwich bag of marijuana; asked defendant to exit the vehicle so he could search it for more marijuana; and, finally, asked for her consent to the search of her handbag. On these facts, we conclude that defendant was indeed seized.

Under Article I, section 9, of the Oregon Constitution, "a seizure occurs when (1) a police officer intentionally and significantly interferes with an individual's liberty or freedom of movement; or (2) a reasonable person, under the totality of the circumstances, would believe that his or her liberty or freedom of movement has been significantly restricted." *State v. Arreola-Botello*, 365 Or 695, 701, 451 P3d 939 (2019). "[S]omething more than just asking a question, requesting information, or seeking an individual's cooperation is required," as mere requests where "the officer does no more than seek the individual's cooperation through noncoercive

questioning and conduct" do not implicate Article I, section 9. *State v. Backstrand*, 354 Or 392, 403, 417, 313 P3d 1084 (2013). Still, it is possible "to restrict a person's liberty and freedom of movement by purely verbal means." *State v. Ashbaugh*, 349 Or 297, 317, 244 P3d 360 (2010). "A verbal encounter rises to the level of a seizure when the content of the questions, the manner of asking them, or other actions that the police take (along with the circumstances in which they take them) would convey to a reasonable person that the police are exercising their authority to coercively detain the citizen." *State v. Reyes-Herrera*, 369 Or 54, 58, 500 P3d 1 (2021) (internal quotation marks omitted). Put another way, our inquiry is whether the circumstances combined would reasonably be construed as "a show of authority requiring compliance with the officer's request." *State v. Bryars*, 319 Or App 464, 471, 510 P3d 261 (2022). We consider the effect of all the circumstances combined "even if the circumstances, individually would not create a seizure." *State v. Newton*, 286 Or App 274, 280, 398 P3d 390 (2017). There is no bright line between a noncoercive conversation and a more restrictive one that effectuates a stop. *Reyes-Herrera*, 369 Or at 67. "[A] slight difference in circumstances could make what was considered a nonrestrictive encounter in one case a stop in another." *Id*.

When the interaction at issue involves a passenger in a traffic stop, one additional principle mediates our analysis. We have explained that "[p]assengers in a stopped vehicle are not seized merely by virtue of their status as passengers." *Prouty*, 312 Or App at 501. That is because, generally, "the passengers in a car stopped for a traffic or criminal offense would not understand that the officer's show of authority in stopping the driver extended to them." *State v. Payne*, 310 Or App 672, 678, 487 P3d 413, *rev den*, 368 Or 514 (2021). Instead, some further show of authority must extend to or be directed at the passenger specifically, such that a reasonable person would understand that "the officer was independently restricting their movement apart from the stop of the driver." *Id*.

We apply those principles to this case. As explained above, the state argues that Held's words and actions only effected a stop of the driver and that a reasonable person in

defendant's position would not have understood that the stop extended to them. Indeed, some facts in the record support that view. Until Held asked for defendant's consent to search the handbag, his inquiries were largely directed toward the driver—his interactions with defendant were limited to exchanging some words with her about her family in the area, asking her "about marijuana," and, finally, asking her to exit the van so he could search it pursuant to the driver's consent. We agree that, when considered individually, those interactions were relatively benign. Held's inquiries about defendant's "family in the area" was no more than mere conversation, and a reasonable person would have understood that Held's request that defendant exit the van was related to his impending search and not an effort to detain her. *See*, *e.g.*, *State v. Orman*, 322 Or App 707, 718, 521 P3d 506 (2022) (noting that an officer's request that a passenger step out of a vehicle so that the officer can begin searching it does not alone effectuate a seizure). Even Held's inquiries "about marijuana," at least on this sparse record, did not accuse defendant of a crime or otherwise demand her cooperation. *See Backstrand*, 354 Or at 403 ("something more than just asking a question, requesting information, or seeking an individual's cooperation is required").

However, we conclude that this is a case where the totality of the circumstances combined to form a more coercive atmosphere than the sum of its parts, such that when considered together, a reasonable person in defendant's situation would not have felt free to leave. The interaction began when Held initiated a traffic stop of the van in which defendant was a passenger, and although Held's initial inquiries regarding the driver's license and rental vehicle documentation appear to have been related to traffic enforcement, the nature of the stop quickly shifted as Held asked "how much marijuana was inside the *vehicle*." (Emphasis added.) That question is significant because it requested information that implicated all occupants of the vehicle. Held then asked if he could see the driver's marijuana, inspected it, told the driver that he believed the bag contained two ounces, and finally requested, and received, the driver's consent to search the vehicle. Like Held's initial question regarding the amount of marijuana in the vehicle, he continued to focus on the

vehicle as he questioned the driver. That sequence of events made clear that Held believed the van contained an unlawful quantity of marijuana and was not satisfied that he had yet seen all of it.

Viewed in that context, by the time Held directed his attention to defendant and asked her "about marijuana," inspected the marijuana she presented, asked her to get out of the van, and, finally, asked for her consent to the search of her bag, a reasonable person in defendant's position would have understood that she was just as much a subject of Held's criminal investigation as the driver and could not simply choose to walk away. We have explained that an officer effectuates a stop when the officer asks a person to prove that they are not violating the law, such as by showing proof of appropriate identification or authorization. *Almahmood*, 308 Or App at 804 (concluding that a reasonable train passenger would not feel free to refuse a police officer's command to show proof of payment). Although the facts of this case are different from those presented in *Almahmood*, Held's questions had a similar effect. Held demanded proof that the van did not contain an unlawful amount of marijuana, and upon discovering evidence that the driver possessed an unlawful amount, demanded proof that there was not *additional* marijuana in the van by requesting and obtaining content to search it. At least by the point in time when Held requested defendant's consent to the search of her bag, the obvious implication of the circumstances as a whole was that Held also required proof that *defendant specifically* did not possess an unlawful quantity of marijuana. That implication was compounded by the fact that, by that point of the encounter, Held had already asked defendant "about marijuana" and inspected the lawful amount she presented. In asking to search her purse after that exchange, Held made clear that he did not believe her that she had produced all the marijuana in her possession. *See Reyes-Herrera*, 369 Or at 66-67 (officer's questions to the defendant asking whether the defendant had purchased drugs or had drugs on him "carried an implication that defendant could be in trouble and must remain where he was" that "was compounded when *** [the officer] requested defendant's consent to search him"); *Bryars*, 319 Or App at 473-74 (officer's

questioning about drug possession despite the defendant's denials "would have conveyed to a reasonable person that he disbelieved defendant" and was "compounded when [the officer] asked defendant for his consent to search").

Defendant was not just inconvenienced by the stop of the van that she was riding in as a passenger. Nor were Held's questions of defendant merely permissible conversational inquiries in connection with that stop. Rather, a reasonable person in defendant's circumstances would believe that both the driver *and* defendant were the subjects of an investigation into whether they illegally possessed marijuana. Those circumstances created a sufficiently coercive atmosphere to effectuate a stop.

The other circumstances present in this case—that the stop occurred during the afternoon, that Held was the only officer present, and that Held did not explicitly accuse defendant of a crime or limit her freedom of movement outside the van—do not change our analysis. "Such distinctions may be relevant when a court considers the totality of the circumstances, but no one fact is determinative, and context is critical." *Reyes-Herrera*, 369 Or at 67. As we explained in *Almahmood*, "a conversation between an officer and an individual that would not otherwise constitute a stop may become one if the officer directly and unambiguously communicates that he or she is conducting an investigation that could result in the individual's arrest or citation." 308 Or App at 801-02 (internal quotation marks omitted). Here, Held's progressing questions unambiguously communicated that he was investigating both the driver and defendant for marijuana crimes. *See also Reyes-Herrera*, 369 Or at 61-62 (explaining that "whether the officer's comments fit the textbook definition of an accusation" is not alone determinative of whether a defendant was seized).

In arguing to the contrary, the state cites a number of our prior cases, decided before the Supreme Court's pivotal decision in *Arreola-Botello*, for the proposition that an officer does not stop a passenger merely by asking them potentially incriminating questions such as whether they are carrying drugs, weapons, or other contraband. *See, e.g.*, *State v. Graves*, 278 Or App 126, 136, 373 P3d 1197, *rev den*,

360 Or 465 (2016) (explaining that those types of questions
are "within the bounds of 'mere conversation'"). Because the
state focuses on *Graves*, however, we do the same. In *Graves*,
the defendant was the passenger in a vehicle stopped for
a traffic infraction. *Id.* at 129. As the officer discussed the
traffic infraction with the driver, he noticed that both occu-
pants had stained fingers, sores on their hands, and a pale
"sickly" appearance that the officer associated with heroin
use. *Id.* After returning to his patrol car to begin the traf-
fic citation, the officer re-approached the vehicle, asked the
defendant to step out of the car, directed her to stand near
his patrol car, questioned her about her criminal history
and parole status, and requested her consent to a search.
*Id.* at 129-30. During that conversation, the officer noticed
a spring-loaded knife sticking out of the defendant's pocket,
resulting in the defendant's arrest. *Id.* at 130.

     In concluding that the defendant had not been
seized, we cited to other then-recent cases such as *State v.
Parker*, 266 Or App 230, 337 P3d 936 (2014), and *State v.
Lantzsch*, 244 Or App 330, 260 P3d 662, *rev den*, 351 Or
318 (2011), explaining that an officer does not effectuate a
stop by asking a passenger to get out of a vehicle and ques-
tioning them about criminal activity absent some "threaten-
ing or coercive show of authority requiring compliance with
the officer's request." *Graves*, 278 Or App at 135-36 (citing
*Backstrand*, 354 Or at 403). We noted the controlling princi-
ple at the time that "[p]olice inquiries during the course of a
traffic stop (including requests to search a person or vehicle)
are not searches and seizures and thus by themselves ordi-
narily do not implicate Article I, section 9." *Id.* at 135 (cit-
ing *State v. Rodgers/Kirkeby*, 347 Or 610, 622, 227 P3d 695
(2010)). In light of the totality of the circumstances, we con-
cluded that the officer's inquiries were "within the bounds of
'mere conversation'" and not the type of inquiries that could
have reasonably communicated that the defendant was the
subject of a criminal investigation and therefore not free to
leave. *Id.* at 136.

     First, we note that it remains unclear whether
*Graves* and cases like it survive *Arreola-Botello. See State v.
Soto-Navarro*, 309 Or App 218, 225-26, 482 P3d 150 (2021)
(noting that *Arreola-Botello*'s objective of preventing officers

from transforming traffic stops into unconstitutional criminal investigations "will be harder to realize if passengers cannot enforce the subject-matter limitations on traffic stops the same way that drivers can" and opining that the Supreme Court may have contemplated that a passenger "would be protected by the subject-matter limitations on traffic stops identified in *Arreola-Botello*"); *State v. T. T.*, 308 Or App 408, 419, 479 P3d 598, *rev den*, 368 Or 37 (2021) (describing "important and novel" unresolved issues raised "in the wake of *Arreola-Botello*" regarding whether an officer seizes a passenger or otherwise exceeds the subject limits of a traffic stop by asking certain investigatory questions). Post-*Arreola-Botello*, we have often concluded that an officer commits a constitutional violation by questioning a driver about contraband during a traffic stop without reasonable suspicion. *See*, *e.g.*, *State v. Hallam*, 307 Or App 796, 806, 479 P3d 545 (2020); *State v. McBride*, 303 Or App 292, 295, 463 P3d 611 (2020). It is not clear how the purposes underlying *Arreola-Botello* are supported by an environment where, as in *Graves*, an officer may make "investigative inquiries" of a passenger regarding criminal activity without effectuating a stop requiring an "independent constitutional justification." *Arreola-Botello*, 365 Or at 712.

Regardless of how those significant questions are eventually resolved, however, we conclude that *Graves*—and other cases like it—are distinguishable from the facts presented here. Held had already discovered an unlawful quantity of marijuana in the vehicle and indicated that he believed there was more by requesting and obtaining consent to search the vehicle. Then, within that context, he turned his questions to defendant, asking her "about marijuana," inspecting the lawful quantity of marijuana she produced, and finally, asking for her consent to the search of her handbag. Those circumstances created a situation that is distinguishable from *Graves* and similar cases, because here Held made clear that he was investigating defendant for a specific crime and did not believe the evidence she produced that she was following the law.

Thus, we conclude that, by the time Held asked defendant to consent to a search of her bag, she was stopped. Where, as here, an officer lacks reasonable suspicion when a

stop occurs, the stop is unlawful and all evidence discovered as a result of the unlawful police action is presumed tainted by the violation and must be suppressed. *State v. Elbinger*, 322 Or App 498, 503, 521 P3d 179 (2022). The state does not argue that the challenged evidence was attenuated from the unlawful stop or was admissible for any other reason. *See Newton*, 286 Or App at 288-89 ("Our conclusion that defendant was stopped for purposes of Article I, section 9, without reasonable suspicion, fully resolves the appeal, because the state has not made any argument that the challenged evidence was, nevertheless, admissible."). For those reasons, we conclude that the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.